American Caribbean Line, Inc. v. Commissioner. Alcoa Steamship Company, Inc. v. Commissioner. Massena Securities Corporation v. Commissioner.
American Caribbean Line, Inc. v. Commissioner
Docket Nos. 109305, 109312, 109748.
United States Tax Court
1943 Tax Ct. Memo LEXIS 464; 1 T.C.M. (CCH) 546; T.C.M. (RIA) 43064; February 5, 1943
*464 Paul G. Rodewald, Esq., 1025 Union Trust Bldg., Pittsburgh, Pa., and David B. Buerger, Esq., 1025 Union Trust Bldg., Pittsburgh, Pa., for the petitioners. Paul E. Waring, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Docket No. 109305, in which American Caribbean Line, Inc. (hereinafter called "Caribbean") is the petitioner, involves deficiencies in 1938 income and excess-profits taxes determined against that petitioner in the respective amounts of $4,462.55 and $1,441.93. Docket Nos. 109312 and 109748 involve liabilities for those taxes against the respective petitioners, Alcoa Steamship Company, Inc. (hereinafter called "Alcoa"), and Massena Securities Corporation (hereinafter called "Massena"), as transferees of Caribbean. The issue common to all three docket numbers is whether Caribbean sustained a loss in the taxable year, not compensated for by insurance or otherwise, by reason of certain of its ship plans becoming worthless during that year. Massena admits but Alcoa denies its transferee liability. Findings of Fact Caribbean was a Delaware corporation incorporated September 24, 1934 pursuant to an agreement between Ocean Dominion *465 Steamship Corporation (hereinafter called "Ocean"), and American Scantic Line, Inc., (hereinafter called "Scantic"), for the purpose of owning, operating and maintaining steamship service between North America and the Caribbean ports. It filed its income tax return for the taxable year with the collector of internal revenue for the Twenty-third District of Pennsylvania. It had 10,000 shares of authorized capital stock of which Massena subscribed for 6,500 shares at a price of $350,000, and Scantic for 3,500 shares at a price of $250,000. Scantic agreed to pay $50,000 cash for 700 of these shares of January 15, 1935, and $200,000 for the remaining 2,800 shares at such time as Caribbean paid to it the $200,000 for a Type A Hog Island freight steamship, capable of 13 knots, to be reconstructed and reconditioned by Scantic according to plans to be approved by Caribbean. The cost of reconstruction to make such freighter into a combination freighter and passenger steamer was to be borne by Caribbean and was expected by the parties to the agreement to cost about $350,000. From October 1934 to March 1935 a naval architect, George G. Sharp, prepared plans and specifications for Caribbean for *466 the conversion of the Hog Island freighter into a combination freighter and passenger steamer. For this work Caribbean paid him or his assistant $18,916. In March 1935 Caribbean received bids from 10 shipbuilding companies for such conversion, and the lowest price bid per boat was $635,000. On learning that the cost of this conversion would be so much higher than originally anticipated, Caribbean awarded no contract and held the matter in abeyance and at the same time obtained comparative figures on the cost of a new ship, the preliminary plans for which were prepared by the same naval architect, Sharp, over the remainder of 1935 at a cost to Caribbean of $4,500. These preliminary plans were submitted to shipyards for estimates which varied between $2,000,000 and $2,500,000 per ship. In March 1936, Caribbean again investigated the cost of reconstructed Hog Island freighter and found that this had increased to $1,110,000. Caribbean, from its incorporation, maintained a freight steamship service between North Atlantic ports and the West Indies and Guianas. It maintained a passenger service from its organization until the Spring of 1937 and used therein reconstructed Hog Island freight *467 steamers which it chartered from Scantic. After the Spring of 1937 Caribbean was unable to charter combination passenger and freight steamships of the Hog Island type. Ships reconstructed under the Sharp plans would have been generally similar to those the Caribbean had chartered from Scantic except that they would have provided more and better accommodations for passenger service than the latter and would have been worth $200,000 or $300,000 more. On July 28, 1937 Caribbean and Scantic cancelled their agreement of 1934 under which Caribbean was to purchase a 13-knot Hog Island freighter from Scantic for $200,000 and for the purchase by Scantic of 2,800 shares of capital stock of Caribbean for $200,000. Simultaneously with that cancellation Scantic sold to Massena for $50,000 the 700 shares of capital stock of Caribbean which it had previously purchased for that amount. At that time the balance sheet of Caribbean reflected the Sharp plans as an asset at their original cost. With that reflection at June 30, 1937 the balance sheet of Caribbean showed a deficit of $15,484.24 and at July 31, 1937, a deficit of $8,654.92. During this period there were approximately 110 Hog Island freighters *468 of the type involved here and Caribbean knew who owned each of these ships, the market price of which varied from $100,000 to $125,000, and their speed was from 10 to 11 knots per hour. The cost of increasing the speed of such a ship to that of 13 knots would have been approximately $75,000. In 1937, upon inquiry of the head of its accounting department, the president of petitioner, who was familiar with the matter, directed that the Sharp plans should not be charged off. He was aware that there would be no tax benefit during that year, but did direct the charge-off of a bad debt of $256. No Hog Island steamers, which were both speeded up to 13 knots and converted to combine freight and passenger service, were on the market prior to 1938. Early in 1938, Scantic, which had gone into a program of building new ships with assistance furnished under the provisions of the Merchant Marine Act, offered to sell such ships to Caribbean for $750,000 each. It would have cost Caribbean to make the necessary changes therein for its purposes about $85,000 per ship. Finally, after negotiations, Scantic gave Caribbean a written option on November 14, 1938, expiring December 31, 1938, to purchase *469 two of the ships for a total of $800,000, three ships for $1,125,000, and four ships for $1,400,000. This option was extended for several months but was never exercised. The ship plans drawn by Sharp were not destroyed. They were kept by Caribbean in a file in its office in New York City occupied jointly with Ocean, where they still are. In 1940, Ocean, which in September 1940 had changed its name to Alcoa, contracted for the construction of three 20-knot combination freight and steamships which were never delivered to Alcoa because they were taken over by the government. On December 31, 1938, at the direction of its president, the auditor of Caribbean charged off its cost of the Sharp plans in the sum of $23,416. These plans were never thereafter reflected in the assets of Caribbean, Ocean or Alcoa. On December 27, 1938, Caribbean entered into an agreement with Ocean to sell, and did sell to it, all of its assets as of midnight December 31, 1938, and Ocean under the agreement assumed all of its liabilities except tax liabilities, in consideration for which Ocean agreed to and did transfer to Caribbean an account receivable of $476,245.42, the amount of the net book value of its *470 assets which include nothing for the Sharp plans. On June 9, 1939, Caribbean was dissolved under the laws of Delaware and on June 28, 1939 it transferred to Massena, its sole stockholder, in complete liquidation, cash in the amount of $456,395.57, which cash was the proceeds of its only asset, an account receivable which was shown on its balance sheet. Opinion Whether Caribbean is entitled to the contested deduction depends first upon whether the Sharp plans became worthless in the taxable year. Revenue Act of 1936, section 23(f). The position of the respondent is (1) that the plans became worthless in July 1937 when Caribbean and Scantic cancelled their agreement for the purchase of a speeded up Hog Island freighter from Scantic and Scantic sold its Caribbean stock, and (2) if the plans did not then become worthless, they continued to have value beyond the taxable year. The petitioners argue that such plans had value until the date in 1938 when it secured the option to purchase 13-knot reconstructed Hog Island freighter and passenger steamships from Scantic at a price of $400,000 to $450,000 each. The basis for this argument is that this price, supplemented by the additional *471 cost of $85,000 per ship for adding the necessary equipment Caribbean desired, would have been so much less than the cost of securing the same equipment under the Sharp plans that the plans then lost all their value. It is true that there is testimony here supporting that basis. One witness testified that the Sharp plans were not discarded after the cancellation of the Caribbean-Scantic agreement in July 1937, but in view of the continued doubt as to which plan Caribbean would use in acquiring necessary ships for passenger service which it deemed expedient and necessary in its business, such plans did not become worthless until the execution of the option with Scantic in the Fall of 1938 for the purchase of such reconditioned and speeded up ships from Scantic. That sole witness did attempt to buttress his testimony on the facts with an expression of opinion that the plans did become worthless when the option from Scantic was executed. Qualified as he may have been, however, that witness was the president of Caribbean. Moreover - and of greater importance - the basis for that opinion is not convincing. Assuming the Sharp plans continued to have value after the cancellation of the Caribbean-Scantic *472 agreement in 1937, it would seem reasonable under petitioner's theory that they would have continued to have value so long as the conditions existed to meet which the plans had been drawn. But, so far as this record reveals, no real change in those conditions occurred in the taxable year. The option to buy the Scantic ships was not exercised. It was allowed to lapse. There is evidence that there were then more than 100 11-knot Hog Island freighters other than those owned by Scantic and that Caribbean knew the owner of each such ship. But there is no indication that there were any other ships than those belonging to Scantic which had been converted to combine freight and passenger accommodations and the speed of which had been accelerated, which could have been bought by Caribbean at a price rendering the use of the Sharp plans unreasonable. All that the Scantic option indicates, in any event, is that if Caribbean had exercised it and bought the needed ships, no reason might then have existed for the use of the plans. Without the purchase of those ships, the condition involving the use for which the Sharp plans were drawn continued. Their value persisted, so far as anything here *473 is disclosed, until 1940, or such time as the purchase of the new ships in that year by Caribbean was decided upon. The plans were not destroyed. They were available to Caribbean, Ocean and Alcoa. The identity of the owner of the plans after 1938 is not pertinent to our inquiry. We think petitioners have failed to establish error in respondent's determination disallowing the deduction by Caribbean of a loss for these plans in 1938. In view of the admission that Massena is a transferee and so liable for any taxes redetermined against Caribbean for 1938, we affirm respondent's determination to that liability. However, as to Alcoa, we hold that respondent has failed to establish that liability. Decision will be entered for the respondent in Docket Nos. 109305 and 109748, and for the petitioner in Docket No. 109312.